The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez! Oyez! Oyez! All persons having any manner or form of business before the Honorable of the United States Court of Appeals for the Fourth Circuit are admonished to draw an eye and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. Macbeth Good morning, Your Honors. My name is Colin Macbeth and I represent the appellant, Timothy Green. Your Honors, the Supreme Court's opinions in Minnesota v. Olson and Minnesota v. Carter held that Fourth Amendment standing in another person's home turns not on a rote checklist of factors, for instance, does the guest have a key to the house or store personal possessions there, but instead on societal and communal norms rooted in common experience. The Court said in those cases that standing law, quote, recognizes the everyday expectations of privacy that we all share. It said that a guest will have standing if his visit represents, quote, a longstanding social custom that serves functions recognized as valuable by society. And in summing up what it means to have a legitimate expectation of privacy, the Court said a visitor will have standing if he expects that, quote, he and his possessions will not be disturbed by anyone but his host and those his host allows inside. Those principles have straightforward application to Mr. Green's case. On June 29, 2017, Mr. Green went for a social visit to his cousin's house, a house he had been visiting one to two times a year for three, one to two times a week for three to four years. Visiting family for social purposes is, quote, a longstanding social custom that serves functions recognized by society as valuable, just as this Court held in Bonner v. Anderson that visiting a neighbor and assisting the elderly is recognized and permitted by society. When someone goes to a family member's house for a social purpose, he expects, in the words of Carter, that, quote, he and his possessions will not be disturbed by anyone but his host and those his host permits. In other words, when you go to your brother's house for dinner, you expect that random strangers off the street, including the police, will not be permitted to walk in unless your brother invites them in. That is what Carter calls, quote, an everyday expectation of privacy that we all share. The government has never argued otherwise. Instead, it simply points to facts that are not present in this case. For instance, that Mr. Green did not receive mail at Mr. Yates' house and had never spent the night there. But rather than looking to what facts are not present, Carter and Olson tell courts to look at what facts are present and then to ask, based on those facts, whether a visit represents a, quote, longstanding social custom that serves functions recognized as valuable by society. Under this test, social guests will, as a general matter, have standing in their host's home. This court has already recognized as much in United States v. Gray, where the court held the defendant lacked standing precisely because he went to his friend's apartment not for a social purpose, but instead for a business purpose. And if the majority opinions in Olson, Carter, Bonner, and Gray are not enough, the coalition of Green has standing in this case. The government does not dispute that five members of the Carter court, which is the relevant controlling Supreme Court precedent, would hold that Mr. Green has standing in Mr. Yates' home because he was a social guest. Nor has the government ever given any explanation for why this court should reach an outcome that is different from and inconsistent with the outcome that a majority of the binding Supreme Court precedent would reach. There is no good reason. As Justice Kavanaugh said in his Duval opinion, the point of the Marx rule, which tells courts what to do when an opinion is split, is to reach results with which a majority of the Supreme Court and the relevant precedent would agree. And as he said, that is what Marx, common sense, and vertical stare decisis all require. So we submit on these facts whether the court wants to announce a general rule of social guest standing or instead a more limited, narrow, targeted holding that Mr. Green has shown he has an expectation of privacy in Mr. Yates' home. For that reason, there is standing and the search that occurred when Sergeant Hansen entered the yard is unlawful unless it was authorized by a warrant or an exception to the warrant requirement applies. Why wasn't it authorized by the arrest warrant? Why wasn't he there to sort of help effectuate the arrest safely? So pursuant to an arrest warrant, police can arrest someone. They cannot use it to search for evidence. So, and I, the way we recognize this is that as part of an arrest, police officers are allowed to secure the scene to make sure that, you know, officer safety is not endangered. And isn't that what happened? I mean, he went into the yard while the arrest was being conducted to make sure that the third party with the gun didn't do something that would be unsafe to the arresting officers. So that is what he did, which means that he can do that only if the buoy prongs are satisfied. There's not some other... I think it's not really buoy so much as just an aid of the arrest. He is part of the group of officers effectuating the arrest warrant. Why isn't... Well, he's part of, the reason the unit is there is certainly to effectuate the arrest. But he said the reason he went in was two things. One, to secure the gun, and two, to seize it as evidence of the harm. Why doesn't number one get him into the yard? He's in the yard. He is allowed to be in the yard because he is trying to help effectuate a safe arrest. And once he's there, the gun is in plain view. Well, it does, but again, only if buoy applies. If an officer can go in for some reason to help the officer... Do you think the other officers needed to be able to make a buoy case to be able to go into the yard to arrest your client? No, they were clearly arresting Mr. Green, though. So was this officer. It takes a lot of officers to... There were helicopters. This was a real show of force arrest of someone suspected to be violent. And I'm just not sure why some officers get to use the arrest warrant, but this one doesn't. Well, an arrest is taking someone into custody, putting hands on them. That is not what Sergeant permissible, but only if buoy says so. If officers can go in for officer safety, even when buoy says they can't, then buoy is essentially meaningless. It imposes no limits. I think the point of buoy is sometimes the place you may be effectuating an arrest in one place and want to go somewhere else, like get into a different room or something. That's what buoy is for. I don't think buoy governs the actual arrest process and says that any hands on the defendant is not effectuating the arrest warrant. So buoy does not speak on its face. The opinion does not address a situation like this where someone is in one part of a yard and the evidence or a gun, let's say, is in another part of the yard. But I think what it means to arrest someone is to detain them, to put hands on them. So any officer who's not touching the defendant is not participating in the arrest? They don't have to individually have hands on them, but they have to be part of the process of detaining that person. It was part of the process. It was an ongoing situation. The officers, the defendant, they're still in the yard. It seems like it was just a couple of seconds later, and there's a gun with a third party, and nobody really knows what's going on. I think even if that's part of the arrest team, he still has to have some basis to believe that the gun needs to be secured. It can't be that if you're executing an arrest, anytime you execute an arrest, no matter the circumstances, if there's a gun present, the officers get to go in and secure it. I mean, I haven't found any case that stands for that proposition. Have you found any case that says when the police are arresting a suspect in a violent crime and there is a third party within arm's reach of a gun, in the exact same place the police are required to conduct the arrest without first securing the gun? Because that just seems extremely dangerous. So I haven't found a case exactly like this. The cases that I've found that are closest are one, this Court's opinion in Yengl, which was an exigent circumstances case, but the analysis is somewhat similar to this case. In that case, most of the analysis in that case focuses on whether the grenade in the closet posed a danger, but the Court also talks about the fact that when the officers arrived at the scene, the defendant's wife or mother told them that there were, I think the words were, a large number of guns throughout the house, and they also told them that a young child was asleep upstairs. Notwithstanding that fact, this Court said there are no exigent circumstances to go in based on that, even though we know there are guns and a potentially reckless young child who presumably is not trained in firearm safety near the weapon. I also cite the Rivera case from Nevada where they weren't effecting an arrest in that case, but they went to a hotel for the purpose of investigating. They saw in the room that there was someone asleep on the bed with his hand under the pillow. They knew the gun was somewhere in the room, didn't know exactly where, and the Court said that does not amount to exigent circumstances either. I think those cases are as close to on point as I've found in either direction. Again, I think if officers are going in to secure the weapon for officer safety, there has to be some quantum of a basis to believe that the firearm represents a threat. I don't think, you know, exceptions to the warrant requirement are supposed to be narrow and jealously guarded, and if the presence of a firearm by itself in every case is enough, then we're past that. We're into a sort of broad per se rule. And in this case, the government's arguments for why the officers were allowed to go into the yard, or Hansen was allowed to seize the weapon, all have to do with Mr. Green. Mr. Green was dangerous. He had fled from police. That's all true. If this were about Mr. Green's access to a firearm, I think they'd have a strong argument. But Mr. Yates is not only unknown to them, meaning they have no information suggesting that he's dangerous or has a criminal record, but in fact, his reaction when officers arrest Mr. Green dissipates reasonable suspicion or probable cause, whatever standard we think it is, because he sits there quiet, motionless. This is clearly not someone who is intent on using firearms against the police. It's not even his firearm. There's no reason to believe he, you know, uses firearms or would use firearms in this case. It's just a weapon sitting across a gazebo on the other side of the table from where he's seated. So, that's, I mean, I think the best answer I can give you as to why the warrant doesn't justify it is that, you know, in effect, the warrant authorizes a limited purpose, which is arrest. He was not arresting. He was doing something that, to be sure, facilitated the arrest. But if that's what he's doing, he has to have some basis that he can give for why the facts justify that. And in this case, all we have is what Mr. Yates, or sorry, what Mr. Green was doing, not what Mr. Yates was doing. And Bowie, in fact, sort of addresses this point. It says that it cites to the Ibarra case, which we cite in our brief, and it says this case is analogous to Ibarra. And that's the case where the Supreme Court said that if you have probable cause as to one person, then another person's mere propinquity to that person is not enough to search or arrest that person. And the Court says a Bowie sweep is like that. You can't just assume that because someone is close to other people who are dangerous that they are, therefore, dangerous as well. And the Court says, this is quoting from Bowie, the existence of the arrest warrant implies nothing about whether Mr. Green was dangerous, that he posed a threat. That simply does not tell us anything about whether a different person, Mr. Yates, also posed a threat to the officers. And so, based on, you know, the fact that Mr. Yates was sitting there quietly, still doing nothing, I don't think there's a basis to infer that he was the person, or he posed any threat to the officers. It's worth noting that, you know, officers were not totally without recourse here. They could, of course, have asked Mr. Yates for consent to enter the yard. There's good reason to think Mr. Yates, excuse me, would have agreed in this case. He's been compliant the entire time. They also could have asked Mr. Yates to walk out of the yard and stand on the street while the arrest was effectuated. There are things they can do, but what they can't do is make an entry to a home, which is at the core of the Fourth Amendment, pursuant to a warrant that does not authorize searches and without an exception to the warrant requirement applying. Mr. McBeth, you don't object to the officers entering the yard to seize your client, pursuant to an arrest warrant, do you? No. Okay, no, you've answered no. The next thing is that, did your client have possession of the weapon when it was seized? No. He didn't? When he was seized. Oh, he abandoned it, didn't he? Yes. Well, he put it on a shelf. Well, he didn't have possession. He must have abandoned it, right? For example, you said your standing was based upon his being a guest. Wasn't he leaving the property? Well, it's not... No, no, no. Wasn't he running from them to leave the property? Yes, he was. Yes. So he had clearly indicated his guest status was ending and he was leaving. So you're a guest in someone's home frequently and you leave something there. You have standing the whole time while you're not there? I'm just asking. Well, if he were not at the scene, that's a good question. Maybe he wouldn't have standing in that case, but he was still at the scene. But he was leaving. Well, but he still has an expectation of privacy. Oh, he does? I think so. If it's a place where he is going...  I'm sorry, what, Your Honor? Do you think that standing extends to storage on someone else's property, too? Well, it would depend, I think. I mean, if in general, if it's someplace that... I mean, yes, one of the factors that this Court recognizes that can or some courts recognize as being relevant to standing is whether you store personal items there. I mean, I think... Of course, this wasn't storage because this was just openly owned, this little place there, whatever it was, like a gazebo or a place like you socialize in the yard. He put it there. They saw that, didn't they? Yes. So why wouldn't this even be an instrument that's connected to the arrest itself? You didn't tell me you have an arrest warrant for someone and there's a gun sitting a few feet away and police officers watching them arrest and that gun says, well, there's a gun there, but we can't do anything about that. We can only take you down. Do you think that would be right? No, so if the other four officers on their way out had finished arresting Mr. Green, were walking out of the yard and saw the firearm in plain view on the shelf, they could have seized the weapon. What if one of those four officers saw it on their way in and grabbed the gun? That would be okay, right? And then put hands on the defendant to arrest him. Yes, if there isn't... It depends on the purpose and I know... I'm sorry. So I'm just sort of struck by this, like a group of five officers is there to conduct an arrest. Four of them can seize the gun, but the fifth one can't. It depends on what any given officer's purpose is and... No, where is that from? Well, so the... Mostly we don't really care about purpose in the Fourth Amendment context. We don't in some contexts, but we do in others and I refer the court to the Jardine case which I cited in one of my briefs, which talks about a case where police brought a drug dog onto someone's front yard to sniff for drugs. The question was, is that a search? And the Supreme Court said yes it is because the officer's purpose for going into the yard was to look for information, to look for evidence. If his purpose had been, you know, if someone goes into a yard to knock to sell Girl Scout cookies, that's not a search, that's permitted. But if the officer's purpose is to seize, to look for information... As part of executing an arrest. Well, that was an arrest case, but I'm saying that... I think the Jardine case stands for the general proposition that you're right, a lot of Fourth Amendment law is objective, but there are circumstances in which it's... So if he had just testified at the suppression hearing, I went in to help the other four officers get full control over the defendant, we'd be good? Well, I think you'd have to look at whether that's credible in light of the record. So, for instance... I think that is what happened. He went into the yard to secure the gun so that his fellow officers could complete the arrest safely. Yes, and again, my point is that that is permissible. An officer can do that pursuant to an arrest warrant, but only if the Bowie description applies, because... So you think Bowie is like a narrowing of police authority when they're conducting arrests, rather than a grant of additional authority? No, I don't, but I think that an arrest warrant carries with it the authority to arrest, and that can include securing someone, but I don't think an arrest warrant by itself... If an arrest warrant by itself permitted officers to just go wherever they think a gun might be, then... Right, but I'm saying Bowie would have come out differently in that case. The court could have just said he was looking in the basement to secure a weapon. He thought there might be a weapon down there. And not, he has to have reasonable suspicion to think there's a person down there who might have a weapon. So, I think Bowie explains how, you know, what's permitted in the scope of executing an arrest warrant if there might be a weapon present. I've seen him over time, so I'd like to save the rest of my time for a bubble. Thank you. Thank you, Mr. McMahon. Mr. Menninger. Good morning, Your Honors, and may it please the court, Jason Menninger on behalf of the United States. Your Honors, the officers in this situation faced a volatile situation with a volatile man who had a violent criminal history. Despite this volatility, the officers acted reasonably under the Fourth Amendment. They acted in the interest of public safety, and most importantly here, they acted well within this court's precedence. And so, we respectfully ask this court to infirm the convictions and to instruct the district court to reinstate the judgment here. You want us to affirm on a ground different from what the district court ruled. Are you not defending the standing holding? So, I am defending the standing holding, Your Honor, and I'm happy to address that. I'll say I think I can go right to plain view, though. We argued that as well. That'd be an alternative ground. But, you know, Your Honor, if you'd want me to discuss standing first, I'm happy to do it. But I was just wondering if we thought the district court was wrong on the standing, maybe we should send this case back for a district court to look at the exceptions in the first instance because they are highly fact-intensive. Right. So, I would respectfully disagree with that. I think we've fleshed out the issues, you know, frankly, ad nauseum. We've had a lot of briefs here. I think the record is what it is. And I just think it is so pollucedly clear that regardless of how we do this, whether we do it understanding, plain view, protective sweep, exigent circumstances, all of these grounds are fully satisfied by the record that you have here. We don't need the district court to opine in the first instance. But, Your Honor, if you'd like me to go to standing first, I can certainly do that. Your argument. Before you do, I want to make sure. Is your position that you can concede standing and still prevail? So, yes, we can. You know, because, again, the plain view exception is a winner for the government. And by that, I mean, as you said, Judge Harris, the arrest warrant itself gets us into the yard. And I'll pause for just a second to say that Detective Hanson was a part of the arrest team. And he wasn't just a part of it. He was actually the supervisor. He was the one who was calling all the shots that day. And to show that he was part of the arrest team, if you look at the record, he was the one that went to the fence line and first engaged Mr. Green. He was the one that first said, police, you're under arrest. Come out with your hands up. Mr. Hanson is doing all that while the other officers are converging from other points. So Hanson was part of the arrest team. The arrest warrant gives Hanson the ability to jump that fence and go into that area. And then he sees in plain view the gun. So that, in and of itself, we think is a way that this court can and should decide this case. We cited United States versus... Let me ask you, at least from a factual perspective, how many officers were there? There were six total. Six officers, and the purpose is that you have a warrant for an arrest. And it is for this particular individual. You approach this property, and apparently it is determined he is there. And at that point, does the defendant... The defendant then leaves where he is to... How does he... Where is he at the time that Hanson actually arrested him? Well, so... To set the scene, Mr. Green and Mr. Yates are sitting in this open-air gazebo in the side yard. At that point, there's three officers in the front of the house at the fence line. They're outside the house at this time? Yes, they're outside of the structure, and the officers are on the sidewalk side of the fence. There's two other officers that are going in through the back. And so they're jumping the fence in the back and coming around. That's Officer Meshaw and, I think, Kopfer. In any event, Hanson tries to get Mr. Green to comply. Mr. Green does not. He stands up and looks left, looks right, looks for an exit, is what the testimony says, pulls a gun out of his pants, puts it on the gazebo, and then, as you indicated, Judge Gregory, of him trying to flee, he tried to flee towards... There's a little entrance. If you look at Joint Appendix page 181, there's a little gate that's on the side of the yard. That's, I think, where Mr. Green was trying to go. There's a little above-ground pool back there. He was trying to flee. Officers eventually jumped the fence and converged on him over in that area. And then... Was that outside the area where the gazebo is? The testimony was it was approximately 25 feet from the gazebo, so it still is within that yard. It still is within the place where the arrest warrant allowed the officers to be. He is arrested, and the arrest warrant is fulfilled, but Hansen chooses to enter the property. So we disagree with that as a factual matter but also as a legal one. Do you disagree he was arrested when he was seized? Right, so the testimony from Detective Hansen is Detective Hansen goes over the fence while the handcuffs are being put on. In other words, it's not that the handcuffs clicked sometime thereafter Hansen goes in. It's a fluid scene. Hansen doesn't know whether the cuffs are on or not. There's a struggle. With regard to the property, you have an arrest warrant and handcuffs are being put on him 25 feet away from wherever this property is. Why is he going in the property? To make the gun safe. To Judge Harris's question, from Mr. Yates, from anybody that might come out of the house, if Mr. Green... Any house that has a gun in it, if you see it, because even though one can lawfully possess a gun in all kinds of situations, and everybody has them, you can go in their house at that point and seize their gun when you have arrested someone outside that house. Yes, that is part of effecting a safe arrest. Officers have the right to go home. We have the ability to have safe arrests. And the concern is not that the defendant is going to use the gun because he is being handcuffed. What is the concern? To be fair, we don't know whether Mr. Green is going to get out of the handcuffs and go grab the gun. That's the whole point. How many officers are securing him? There's four that were on top of him. Four officers are holding him, handcuffing him, and you have a fear that he's going to Superman, get these men off of him and rush back in and get a gun when he didn't bring the gun out. The gun is left. If he wanted to use the gun, he would have taken it with him. Why would he do that? Your Honor, a reasonable officer in this situation is going to know gun, violent individual, there's a struggle, he's not complying with the arrest. We don't know who Mr. Yates is at that point. We don't know if there's anybody else in the house. Absolutely, those officers are permitted to make that gun safe. I just want to be clear in terms of our holdings because I think it impacts not only this case but Second Amendment rights of homeowners and people who have homes that once a person is outside of the home, you are saying that police, if they know there's a gun in this home, can enter the home for that purpose because they know you have a gun in your home. It's the home of, I guess, Mr. Yates or someone, and they can enter this home? So under the protective sweep doctrine, they can enter the home. And I want to be clear here, we didn't enter a home here. We're still in this side yard out in the open. And so that gets us to the standing argument. Privacy in that area is no question as it would be the home. The question being is you've got four officers securing the defendant with handcuffs and you make a decision to go into the area, the private area, to secure something, a gun, that's left behind. I mean, it sounds plausible, but I'm wondering, could you have gotten a search warrant for it? You know, maybe. I guess what I would say, Your Honor, is the concern, the worry is we don't know who Mr. Yates is. We would have to essentially talk about an intrusion of privacy. We would actually have to put Mr. Yates under lockdown while we got him. We basically have to tell that man to exit your own home. Your concern is safety. Once you have four officers holding the defendant down, you know there's a gun on the table in there, but a gun is in and of itself, there's nothing illegal about having a gun in a home at all. Absolutely nothing illegal about that. It's like having a cup in there, based upon the cases I've been seeing on it. And so you think that the homeowner or whoever is there might do something. Well, once you have, you didn't go there for that purpose, but once you've abated that purpose, why seize the gun? I mean, why do you get to take the gun? Right, so a couple things, Your Honor. Number one, I don't think we had abated any danger. Again, Mr. Green is still struggling. We don't know who Mr. Yates is. We don't know anybody else in the house. What was Mr. Yates doing? He was sitting there by the table. Where was he in proximity to the gun? So there was a table between them. There isn't great testimony on it, but the picture of the table is in the record. My estimation would be about three feet. So imagine the table that we're looking at here, the gun is at the corner over here. I guess, you know, you have this case, but I'm just wondering where does this go in terms of what can be done by police officers, not just to Mr. Yates, but any homeowner, that if someone is visiting you and that person is deemed to have standed and your purpose is there to arrest that person, not for something that's going on there, but for a previous event, a matter that he dealt with, a confrontation with other people, you have him with four officers, and you only have Mr. Yates there, and there's no indication of anything, but your position is if there is a gun, you can take it. So, yes, in the sense that, you know, in the plain view doctrine and to make the gun safe, and I know Your Honor was concerned about, well, where is this case going and what could happen? My position is... Did the gun have to belong to the defendant? Could it have been Mr. Yates' gun? Right, so even if it was Mr. Yates' gun, we still have the ability to make it safe. All the guns in his house you could take. But we have the ability to make it safe. Seizing is a different matter. What does it end? I mean, you should secure guns in a house, but a lot of people got guns laying all over. You can take them all? So in the interest of officer safety, the precedents that we have allow us to do what happened here. You know, so Your Honor was interested in, like, where is this law going to go? The law's already gone there. In other words, we cited United States v. Legg. That's a case where we go into a house, we're doing a search warrant, officer tips over a gun. There's a lot of people around. This court... Here is a warrant for an arrest, and you have arrested the individual. There may be some factual dispute on it, but four officers handcuffing an individual is pretty close to an arrest. So you've already effectuated the arrest. The question is, once you've done that, where is the need to enter the home? So again, we didn't enter the home here, but... Enter the area in which there was an expectation of privacy. Right, and so, you know, again, under officer safety, the officers cannot be executing an arrest while at the same time there's a gun out in the open that could threaten their safety. That's Bowie, that's Legg, that's Reed. A number of cases from this court that say exactly that. Counsel, I'm not disagreeing with you. I'm just saying, how broadly do we write this? Or how broadly do we take this? Because it seems to me it goes quite broad. Because you can't simply differentiate from these particular facts. You've got a bad guy and it's all happening. This could be anyone. Someone could be a guest of your home who comes and you've got your gun up there. You don't even know what's going on. They come in, they arrest the guy outside, four people on him. They didn't come in your house or your area of expected privacy. Take your weapon from them. Your Honor, what I want to say is Fourth Amendment analysis are always fact intensive. And we are, we said it in our brief, we're not asking for categorical rules here. Just on these facts, as presented here, this was appropriate and lawful. Counsel, can I ask you, just following up on Judge Wynn, there's the question of securing the weapon and then, as you said, there's a question of seizing it. And you can only seize it if it's obviously contraband. If there's no reason to suspect that the gun is contraband, after you secure it, you have to leave it, right? Okay, so why were they able to seize this gun? Why was it obvious that this gun was contraband? Because they knew that Mr. Green was a prohibited person. So that's in the record. Detective Hanson testified to that. They all knew he had a criminal history. He had a Virginia robbery conviction. He had a Maryland first-degree assault conviction. And then he was obviously accused of this home invasion. And so all those things showed he was not someone that was supposed to possess a gun. So what you need, just conceptually, is if Officer Hanson is legitimately in the curtilage, the rest of the Plainview stuff kind of washes out. You can check the rest of the boxes on Plainview, but you need to get him into the curtilage. Correct. Okay. Correct. Before too much of my time runs out, I do want to address standing. No one was hiding at the time that they entered for the purpose of the protective suite. No one was hiding. So no one else was found in the yard? That's right. It was just Mr. Yates. Could you have secured Mr. Yates? Could you have moved the gun? Can you just simply move him to a place where the officers would not face danger? There's no one else there. No one else is hiding. It's an open area, as you say. It's not the home. Everybody can see everybody. You're there to arrest. Why not just seize him or secure him in a place while you do your arrest? Because once you do your arrest, I don't know what gives you then. You've got a homeowner. Any homeowner could have a gun. They could always go get it. There's nothing protective about that unless everybody that has a gun you're going to do one of those with. Could you have secured him? I believe we could have. Your concern was with Mr. Yates at the time, not the defendant. You've got four people on a defendant with handcuffs. No reasonable person believes that your concern is that at that point, so it's Mr. Yates. Why not secure him? As I say, Fourth Amendment is always about balancing. Imagine what the difference is. You are an innocent homeowner. You invited someone over. All of a sudden, the cops are securing you and putting handcuffs on you. Is that more of an unreasonable intrusion as to just securing? This is an arrest warrant. This gun. This is an arrest warrant. But you say it's a fact-intensive matter. Well, so are you asking us to send it back to the trial court to conduct an analysis of these facts on here? No, Your Honor. Again, I think the record is more than fleshed out and we can decide this. Now I'm just sort of confused. If Officer Hanson theoretically could have just kind of subdued Yates, made sure that the homeowner, like moved the homeowner, he still would have had to jump the fence to do that, right? Yes. And then he would have just been able to seize the gun because it's obvious. All you need is some way to get him over the fence, whether he's there to sort of secure Yates or to secure the gun. And I think what he did was basically stand between them. He kind of secured both of them at the same time. But either way, he's over the fence and once he's over the fence, he can seize the gun. Correct. Yeah, the arrest warrant gets us in and after that, it's game, set, and match under plain view. I do want to discuss just very briefly the standing issue. We do respectfully submit that you could decide this on standing. Mr. Green had no reasonable expectation of privacy. We're talking about a side yard. Everybody can look in it. It's not his home. He doesn't have a possessory interest in it. He can't exclude anybody from it. He had none of his possessions there. And most importantly, under this court's precedence, he had contraband. He had contraband that Mr. Yates neither knew about nor consented to. And under United States v. Ladd, that is a loser for him. United States v. Ladd, I have to say, I was expecting to find more when I looked it up. It's like two sentences in a two-paragraph opinion. I don't know whether the defendant was lawfully admitted. I don't know if he was a social guest. I don't know if he was an overnight guest. And also, for what it's worth, I don't understand how unconcealed contraband can be put in a house without the owner's knowledge. If it's unconcealed, I find that it's just like two kind of baffling sentences to me. Tell me what I'm supposed to draw from that case. So what I think respectfully you should draw from that is that social guests, if you were going to say, let's just assume social guests have some modicum of standing. We don't agree with that, but let's assume that for a second. Their license is only as far as the owner will give them. In other words, come on to my house and have dinner. I will share my dinner with you. That is perfectly reasonable and lawful. But I'm certainly not inviting you over to bring a bag of heroin with you unless I know about it and I consent to it. And that's what we have here. Mr. Yates was put in this very dangerous situation. He didn't know that the cops and the air was going to drop into his home and six officers were going to jump his fence. It actually put Mr. Yates' life in a lot of danger, to be quite frank. And so that's why this rule makes sense. You can't allow a guest to come on and bring dangerous things here. And to be clear, LAD is binding precedent, I believe, on this court. The Fifth Circuit also agrees, United States v. Phillips, we cited that. There's an Eastern District of North Carolina case, United States v. Jenkins. So the contraband issue, I think, is one that I don't think Mr. Green can avoid. That is precedent that this court has set. To talk about a categorical rule, this court said, where here is one wrongfully places unconcealed contraband within the house of another, no expectation of privacy can arise. The gun wasn't unconcealed when the officers first went in, right? He had it in his shorts? Right, so he pulled it out, but obviously at no time did Mr. Yates agree or consent to the placement of that gun. It had to be unconcealed, and it was concealed at the time of the intrusion. Well, it was, I guess our view is, unconcealed in terms of, you know, when he comes onto the property. In other words, I just think you have to have the homeowner say, I'm giving you license to be here, and that includes all of these things that you can bring onto my property, and he gave him no right to have the gun. There's also no subjective expectation of privacy. Does the analysis change if you do not, if Henson does not see him place the gun there? In other words, if the gun is just there, and he didn't place it there, does your case change? Yeah, and Judge Gregory, I see I'm over my time. Is it okay if I answer Judge Wynn's question? So, Your Honor, your hypothetical is the gun is just sitting there next to Mr. Green. It's just a question. It's a question as to whether, it is a fact in this case that Henson saw him put the gun there, and you've played upon that. My question is, does this case change if the gun is simply sitting on that table? He didn't have, he wasn't even around it, or didn't do anything with it, and then you arrest him. Does the case change? So I don't think so, and my answer is... So it doesn't matter, in your perspective, our analysis, it matters not that Henson saw him put the gun on the table. It matters not that Henson knows he's a felon. That is irrelevant to this analysis. That's all I need to know. If that's the case, I want to know what the presence of the gun means and how widely this is. Is it determinative by the fact that he saw him put that gun up there, and as you say, concealed, it becomes contraband. But a gun sitting on a table by itself, is that contraband? So I want to make sure I'm answering your question, that I'm clear. I need to know how you think about a gun. Is a gun sitting on a table with no one around it, is that contraband? So the officers have to know that it's contraband to do the seizure. And they know it's contraband. That's why I asked the question. It's a simple question. Is a gun sitting on a table in a house, in and of itself, contraband? That's an easy question. Not in and of itself, with nothing else, Your Honor. That's the answer I wanted. So my question was, if he had not seen him, you said that's not relevant, that he actually placed it there himself, that it could have just been sitting on a table. So what would make that contraband? So here's my answer to that, Your Honor. It'd be constructive possession. In other words, assume this is the gun. It's sitting next to, in proximity to Mr. Green. A reasonable officer can say, it's sitting right next to Mr. Green. He has constructive possession of it. That is now a 922G1 violation. Therefore, he's in constructive possession of it. That's contraband. I'm in the yard because of the arrest warrant. I see that in plain view next to him. I can get that gun. But again, we're not here because, obviously, we saw Mr. Green take it out of his shorts and place it down. There was active, actual possession. So we're not there. I think Judge Winn's question, at least mine would be followed up with that, I think the counterfactual he's asking you, I think, or at least I'm asking, because I certainly speak for Judge Winn, speak for himself, but it's that Yates is sitting there and you never saw Green do anything other than flee. And it's just sitting there and there's no observation of Green touching or being around that. I think that's the question. Would that make a difference in this case? Right. And, you know, I guess I can't speak to that because it's such a hypothetical, but I think my view of it would be there would be a number of arguments that we would make. You know, we saw Mr. Green in the yard. We knew four days earlier he had a black handgun. There's testimony from Mr. Hanson, Detective Hanson, that, you know, that gun could have matched the one that did the Sweet Bay invasion. And so the question would be, is there enough of a connection between Mr. Green and that gun to think that that is the contraband that he possessed? You need something more than what was seen just on the scene. Perhaps. That's the first thing you mentioned, you know, about the description of his weapon, that kind of thing. Because then you're backing up into Judge Winn's questions about Second Amendment and those things like that because someone being arrested in your yard doesn't mean you can now take everything, including the gun, and seize it. But that's a counterfactual. But I think that was the question. So it may be a difference. Right. And thank you, Your Honor. I appreciate that. And that's why I think this is, frankly, an easier case because we see him literally pull it out. Everybody sees that he has it. The officers yell, gun. And at that point... You said that didn't matter. You said that didn't matter to this analysis. The fact that you saw him pull it out and that you knew it was a foot felon, you just told me. You said it didn't matter. So your hypothetical, Your Honor, said if it's just sitting next to him... Hypothetical? Your analysis. I'm talking about your analysis. I didn't forget the hypothetical. I said, does it matter that he had that? And apparently, to your analysis, you said that did not matter. And pardon me if I was unclear. I'm answering your hypothetical of is it close to him, does it matter that he didn't pull it out but that it was close to him. And my argument was, if it's close to him or he pulls it out, it's actually the same. We get to constructive possession. But that was my answer on that. Your Honor, I think there's a number of ways that this Court should affirm. But at the end of the day, this was just a volatile situation where the officers, I believe, acted reasonably under all of these courts' precedents. So we do respectfully ask that this Court would affirm. Thank you, Mr. Manager. Mr. LaBeth, you have some time reserved. Thank you, Your Honor. I'd like to start by taking another crack at Judge Harris's question about why the arrest warrant did not permit Sergeant Hansen to jump the fence and head to the gun. And I'm going to quote from a case I cited in our briefs, United States v. Green, from this court in 2010, which says, where law enforcement officers possess an arrest warrant and probable cause to believe a suspect is in his home, the officers may enter and search anywhere in that residence in which the suspect might be found. So a warrant, an arrest warrant, allows you to go where the suspect might be found, and then Bowie, as you were saying, Your Honor, expands that. It says you can go not only where the suspect might be, but... But he was where the suspect might be found. He was 25 feet... It's the yard. Well... It's the yard. I don't... Okay, so you think you have to be within a certain number of feet of the suspect, even if you are in the place where the suspect... Not only do you have reasonable suspicion he'll be found there, you can see him. Well, the point of saying that you can go where the suspect might be found is that that's where you can put hands on the suspect. That's the point of limiting the warrant to those places. Can I ask you a question? Is there such a thing as inevitable seizure? You know, like we have inevitable discovery? Because it does strike me that whether... I mean, you agree that four officers were legitimately in the yard. I'm sure they could see the gun from where they were. It was something like 25 feet away. One of them is going to pick up that obvious contraband on the way out anyway, so does it matter? So two points. One, there's no testimony that any of the officers saw the weapon, and in fact... The gazebo has no walls, right? It doesn't, but two points on that. One is, if you look at... I think it's pages 177 to 178 of the appendix, there's a curtain around that pillar, just that one pillar of the gazebo where the gun is situated. And on top of that, or in addition to that, sitting on top of the gun is this weird object that basically looks like the bottom half of a scarecrow. It's like a pair of jeans that someone has stuffed with something, tied off the bottoms, and that is sitting over the ledge on top of the gun. So it's not at all clear that somebody would have seen... What if, hypothetically, the four officers who you think were legitimately in the yard did see the gun? Is there... But also, Officer Hanson jumped the fence, just as here. Is there, like, an inevitable discovery rule that applies to seizures? So one way or another, that gun was leaving the premises with the police. Yes, so again, I think if those four officers had arrested Mr. Green and were leaving the premises as they would have done anyway and saw the gun on their way out, they could have seized it in plain view. And if that is so, does it matter that it, in fact, was seized by Officer Hanson in what you think was an illegitimate entry to the curtilage because it would have washed out anyway? Well, I think it does for two reasons. One is, as I said, there's no evidence that those officers did see the gun, and in fact, there's good reason to believe they wouldn't have seen the gun. And in fact, Corporal Mushaw testified at trial. He's one of the officers who came in from the side yard. He testified when he tackled Mr. Green to the ground, he thought Mr. Green might still have the gun on him. So he clearly had not seen the gun on the gazebo pillar. And again, we have the curtain, we have the scarecrow thing. So that's one reason to think that that doesn't matter. The other is, you may be sort of hinting at a sort of collective knowledge issue in which, you know, Officer or Sergeant Hanson was aware of this. Those officers are in the yard. Can't they just seize the gun? But collective knowledge, you know, this court held in Massenburg that collective knowledge has to be communicated, either in order or information has to be communicated. So it does matter, you know, which particular officer knows what at what time. And I think that's sort of, you know, maybe an answer to your question about why does it matter that Sergeant Hanson was, you know, was hopping the fence not to put hands on Mr. Green. But for another reason, it's because if we're sort of amalgamating, you know, what officers know, it has to be communicated. And that didn't happen in this case. Did Hanson see him put the gun on the table? On the ledge, yes, he did. So, and he knows he's a felon? Yes. And he's convicted of possession of a gun as a felon? Yes. To convict him, do you need the gun? So... I mean, you got the testimony. The officer says, I saw him with a gun, put it on a table. He's a felon. Do you need the gun? So, I think you're asking basically whether the error is harmless. And I think the answer is that the court can't be confident that it... I'm asking even if you win a motion to suppress of this, could he still be tried on it and convicted of it, essentially? But, yeah, it could be harmless too. But it seems to me that if a charge is possession of a gun, there are many cases in which individuals are convicted of it. I mean, you could see them with a gun and throw it in a river and you still could be convicted of it. So, I'm curious as to... But I haven't heard the government present that, but it seems to me... I'm baffled that it seems like to me you could be convicted of that crime. But it probably helps to have the gun, but... So, I think that's the most important point, Your Honor, is it helps to have the gun. So, yes, the government could try, could go to trial on Mr. Green on this charge without having the gun. But imagine how that trial would play out. I mean, the government comes in and says, our officers saw him in the yard, take a gun out, put it on the ledge, we entered the yard, we arrested him, and there's no gun. I mean, that's the defense right there. Where's the gun? You said you saw the gun, you went into the yard, you arrested him, and yet you don't have the gun? I mean, especially, again, given that, as the officer testified, it's a fast-moving situation. There's this curtain on the pillar. There are all these reasons to think that a jury... Your problem is the seizure of the gun, not seeing the gun. Right. So you could go in and see the gun. You could go in and ask Mr. Yates, is that your gun? You could volunteer at his house. You've got a lot of evidence there. You've got witnesses all over the place. People see this gun. He saw him put it down. You go in and see it. I think it would play out pretty significantly against you. So certainly the government could make that case to a jury, but with a constitutional error, assuming there is one, the government has to show, beyond a reasonable doubt, that the error was harmless. And I don't think in a case like this that they can make that showing. So I say them over time, Your Honor. Unless the Court has further questions, I'll stop there. Thank you, Mr. McBeth. Mr. Manager. We'll come down and... We'll come down and greet counsel to proceed to our next case.
judges: Roger L. Gregory, James Andrew Wynn, Pamela A. Harris